NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-97

COMMONWEALTH

vs.

RYAN VIBBER.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A District Court jury convicted the defendant of operating a motor vehicle while under the influence of intoxicating liquor and negligent operation of a motor vehicle.  On appeal, the defendant claims that the admission of certain testimony and a comment in the Commonwealth's closing argument require a new trial.  We affirm.

Background.  We summarize the relevant facts as the jury could have found them, leaving some for further discussion. After seeing a vehicle roll through a stop sign at 12:30 A.M., police Officer Kevin Realini[1] watched the vehicle then cross over

_____

[1] Realini was promoted to sergeant after the incident in this case.

the white fog line -- so far that both passenger's side tires hit the grassy area on the side of the road -- before overcorrecting to the left and crossing over the double yellow lines. Realini did not see anything in the road that would have caused the vehicle to swerve like that. He stopped the vehicle and spoke to the driver, the defendant, who said that he was coming from a party where he drank alcohol.

Realini noticed that the defendant's eyes were bloodshot and watery, and that he had "a slight slur to his speech [that] sounded like he had a heavy tongue." A "strong odor of an alcoholic beverage coming from inside the vehicle" followed the defendant as he exited. Papers that were in the defendant's lap also fell to the ground as he exited the vehicle, but the defendant did not react until the second time Realini pointed them out.

Realini administered field sobriety tests to the defendant, which Realini defined as "basically divided attention tests. They are made to have an individual do something physical while remembering instructions at the same time." First, Realini administered "a simple directions test," wherein the defendant was told to follow a pen only with his eyes and not move his head. The defendant "wasn't able to complete the test as administered" because he kept moving his head to track the pen.

2

Next the defendant tried the "walk and turn test," wherein he took too many steps, raised his arms for balance and kept them up for the duration of the test, and spun around quickly despite being instructed not to. Finally, the defendant did "the one leg stand test," which he was able to complete by holding his arm out for balance (after being instructed to keep both arms down). And contrary to the instructions before each test to wait for Realini's direction to begin, the defendant started both of the last two tests early. Realini formed the opinion that the defendant was intoxicated, arrested him, and brought him to the station three to four minutes away for booking.

Portions of the audio-visual recording of the defendant's booking were admitted in evidence and played for the jury, and we have reviewed the footage. In slurred speech, the defendant repeatedly stated that he had just left the home of a State police trooper whom the defendant was "not saying [was] gonna save me," but who "need[s] . . . to help me out."

Discussion. Realini described the horizontal gaze nystagmus (HGN) test as a "simple directions test" pursuant to the judge's ruling on the defendant's motion in limine stating that the opinion testimony relative to the test was inadmissible, but the Commonwealth could elicit testimony about "whether or not the defendant could follow simple instructions

3

such as keeping his head still and following the moving finger only with his eyes." See Commonwealth v. Sands, 424 Mass. 184, 188 (1997) (HGN test result evidence requires expert testimony due to test's scientific nature). At trial, and on appeal, the defendant objects to the simple directions exercise being called a "test," arguing that doing so falsely lends it "an aura of scientific validity." Commonwealth v. Gerhardt, 477 Mass. 775, 776 (2017).

The judge was not wrong to overrule the defendant's objection and admit the evidence. See Commonwealth v. Brown, 83 Mass. App. Ct. 772, 774 n.1 (2013) ("The testimony of a police officer about the results of ordinary field sobriety tests like those involved in this case . . . is lay witness testimony, not expert witness testimony"). A lay juror, who "understands that intoxication leads to diminished balance, coordination, and mental acuity from common experience and knowledge," Sands, 424 Mass. at 188, would also understand that Realini's "simple directions test" was not "testing" the defendant's "mental ability to understand and follow directions and to perform divided-attention tasks . . . in the same way that a chemist in a laboratory tests a sample for the presence of a particular substance." Gerhardt, 477 Mass. at 784-785. This is especially true considering Realini's descriptions of the test and of field

4

sobriety tests in general.  There was no prejudice from admitting the evidence in any event where the testimony was that the test could not be administered; as such, there was nothing from which any aura of scientific validity could have emanated (false or otherwise).

In its closing, the Commonwealth urged the jury to find that the defendant was under the influence of alcohol based on five categories of evidence, one of which included the defendant's statements "[r]epeatedly emphasiz[ing] repeatedly, I'm coming from a state trooper's house."  The prosecutor argued:

> "Why is that relevant?  I think you can use your common sense why he might think that's relevant.  But why is that relevant that he's coming from a state trooper's house?  A state trooper who notably we didn't meet.  Wasn't here.
>
> "At one point just to give a little insight about why he's bringing up that state trooper when he says, quote, 'I'm not saying he's going to save me.  But I need to talk to him.'  Save him (inaudible)."

The defendant objected to the comment about not meeting the trooper and asked for a curative instruction that was not a missing witness instruction.  The judge agreed to address the issue with the jury, except that the parties could not agree on language.  Ultimately the judge said, "Why don't I just leave it the way it is. . . .  It's just going to draw more attention to it."  The defendant responded, "Okay."

5

Based on this exchange, the Commonwealth maintains that we should review the defendant's claim that the prosecutor's comment was impermissible burden shifting for a substantial risk of a miscarriage of justice.  The defendant asks us to review the error for prejudice.  Preliminarily, the argument had a solid basis in the video footage and was a fair comment on the defendant's state of mind.  "We have never criticized a prosecutor for arguing forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence."  Commonwealth v. Kozec, 399 Mass. 514, 516 (1987).

To the extent that the prosecutor's comment could have been interpreted as one suggesting the defendant had some burden to call witnesses, however, the "slip was corrected and does not provide a basis for reversal."  Commonwealth v. Gomes, 443 Mass. 502, 510 (2005).  The jury understood that closing "argument" was just that because the judge's instructions at the beginning and end of trial "inform[ed] the jury that closing argument is not evidence."  Kozec, 399 Mass. at 517.  Such instructions may mitigate prejudice, id., and we are confident they did so here, particularly where the judge also repeatedly gave "clear, specific, and thorough" instructions on the presumption of innocence and the Commonwealth's unshifting burden of proof.  Gomes, supra.  He also told the jury not to "speculate about

6

things about which there is no evidence."  "We presume, as we must, that the jury follow[ed] the judge's instructions and underst[ood] the argumentative, not factual, nature of closing arguments."  Commonwealth v. Olmande, 84 Mass. App. Ct. 231, 237 (2013).  See Kozec, supra ("A certain measure of jury sophistication in sorting out excessive claims on both sides fairly may be assumed").

Viewed in the context of the prosecutor's entire argument, the judge's instructions, and the strong (if not overwhelming) evidence of the defendant's impairment, see Gerhardt, 477 Mass. at 780 (describing "eight specific indicators of impairment" officers look for in walk and turn test and four indicators in one leg stand); Commonwealth v. Gallagher, 91 Mass. App. Ct. 385, 392-393 (2017) ("classic symptoms of alcohol intoxication" include bloodshot and glassy eyes, odor of alcohol, and slurred speech), the passing reference to the State police trooper's absence did not possibly make a difference in the jury's conclusions.  See Commonwealth v. Rodriguez, 437 Mass. 554, 565 (2002); Commonwealth v. Kater, 432 Mass. 404, 422-423 (2000).

There was no prejudice and no substantial risk of a miscarriage of justice.

Judgments affirmed.

By the Court (Desmond,
  Brennan & Smyth, JJ.[2]),

Clerk

Entered:  October 7, 2024.

---

[2] The panelists are listed in order of seniority.